IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

TONY RAY WIK,                                          CV. 07-1726-HA

            Plaintiff,                    OPINION AND ORDER

     v.

STEVE    SHELTON,    M.D.,    GREGG
LYTLE, M.D., MANAGER B. WHELAN,
NURSE C. FRANCIS, NURSE DIETER,
and BART ADAMS, M.D.,

            Defendants.

        Danielle J. Hunsaker
        Reilley D. Keating
        Stoel Rives, LLP
        900 SW Fifth Avenue, Suite 2600
        Portland, OR 97204

            Attorney for plaintiff

        John Kroger
        Attorney General
        Joseph G. Groshong
        Assistant Attorney General
        Department of Justice
        1162 Court Street NE
        Salem, OR 97301-4096

            Attorneys for defendant

1 - OPINION AND ORDER

HAGGERTY, District Judge.

Plaintiff, an inmate at the Two Rivers Correctional Institution ("TRCI"), brings this action pursuant to 42 U.S.C. § 1983. Currently before the court is defendants' Motion for Summary Judgment [37]. For the reasons which follow, defendants' Motion for Summary Judgment is granted.

## EVIDENTIARY OBJECTIONS

As an initial matter, defendants object to the court's consideration of a variety of hearsay evidence contained in the Affidavit of Tony Ray Wik. The hearsay objections are based upon what non-parties (including non-party medical providers) allegedly told plaintiff during the course of his treatment. Fed. R. Evid. 803(4) provides an exception to the hearsay rule for statements made by a patient to a doctor, but not for statements made by a doctor to a patient. Accordingly, these statements by non-parties do not fall within any exception to the hearsay rule.

Defendants also object to plaintiff's and his attorneys' interpretations of his medical records. Fed. R. Evid. 702 permits expert testimony only where the expert is qualified by knowledge, skill, experience, training or education. There is no showing that plaintiff or his attorneys are sufficiently qualified to draw expert medical conclusions from the evidence.

Finally, defendants object to the admissibility of the *Merck Manual* medical publication as a means to establish the standard of

2 - OPINION AND ORDER

care for patients with suspected retinal detachment. This publication constitutes inadmissible hearsay during summary judgment because, even if it is a "learned treatise" under Fed. R. Evid. 803(18), that Rule only allows a party to admit those statements which have been "called to the attention of an expert witness upon cross examination or relied upon by the expert witness in direct examination." Accordingly, the court finds defendants' objections to be well-taken, and therefore will not consider the evidence which does not conform to the Federal Rules of Evidence during its disposition of defendants' Motion for Summary Judgment.

## FACTUAL BACKGROUND

On June 27, 2005, plaintiff was injured when a basketball hit him in the face while he was in the yard at TRCI. On July 22, 2005, plaintiff reported that he was having trouble seeing, and he was examined by Dr. Lytle on July 27, 2005. Dr. Lytle, a family physician employed by the Oregon Department of Corrections ("ODOC"), determined that a specialist outside the prison needed to evaluate plaintiff, and referred him to Dr. Adams, an ophthalmologist. Dr. Adams saw plaintiff on July 28, 2005 and found that plaintiff had a vitreous collapse, but that his retina appeared to be alright. He noted that plaintiff should be re-checked in two months, or sooner if plaintiff experienced increased flashes, floaters, or a curtain over his vision. Affidavit of Danielle Hawkins, pp. 662-63.

3 - OPINION AND ORDER

According to plaintiff, on August 1 and August 2, 2005, he verbally notified a unit officer that his vision seemed to be deteriorating. Aside from plaintiff's own assertion, there is no record of these verbal interactions. On August 3, 2005, plaintiff reported to Nurse Francis that he had a mercury-colored tab in his right eye. Nurse Francis indicated that she would pass this information along to Dr. Lytle. In an answer to an interrogatory, Dr. Lytle states that he learned on August 3, 2005 that plaintiff was complaining of eye problems. Affidavit of Danielle J. Hunsaker, Exhibit 4, p. 2.

On August 5, 2005, plaintiff reported to Nurse Dieter that his vision was getting worse. According to plaintiff's affidavit, he advised Nurse Dieter that he was blind in the bottom half of his vision in the right eye. Affidavit of Tony Wik, p. 3.

On August 11, 2005, plaintiff had not received any treatment, and recalls that he could see only "huge, black floaters," and the lower half of his sight was still black. *Id.* Dr. Lytle saw plaintiff on August 12, 2005 and immediately referred him to Dr. Michael Warner, an ophthalmologist outside the prison. Dr. Warner saw plaintiff that same day. Plaintiff did not report any eye pain, but demonstrated retinal and macular detachments in his right eye. Hawkins Affidavit, Att. 1 at p. 609. Dr. Warner recommended that plaintiff "follow up urgently with Dr. Sung, a retinal

specialist, in Kennewick for repair of the retinal detachment. This should take place within the next 24 to 48 hours." *Id.*

That same day, plaintiff was immediately transferred to Dr. Sung's office where he both underwent surgery, and was discharged. *Id* at 611. Between August 13 and August 18, 2005, plaintiff was kept in the infirmary at TRCI where Dr. Lytle and other medical staff actively monitored his condition. *Id* at 137-147.

During follow-up treatment, Dr. Sung scheduled plaintiff for an injection in his eye to reduce swelling caused by the surgery. *Id* at 648. The injection was required because plaintiff was diagnosed with cystoid macular edema, a post-operative complication requiring an injection of Kenalog, an anti-inflammatory liquid. Report from Dr. William Baer, p. 2. Prior to the scheduled appointment, Dr. Sung faxed TRCI a prescription for an antibiotic which plaintiff needed to take prior to the injection. Plaintiff asserts that TRCI did not give him the prescribed drug, and the injection appointment was cancelled as a result. Defendants deny that any evidence indicates that they failed to provide the prescribed medication or that the timing of the identified appointment was medically necessary. In any event, it is clear from the record that plaintiff's appointment was cancelled and rescheduled approximately two weeks later because plaintiff had not used the prescribed drug. Hawkins Affidavit, Att. 1, p. 649. It appears from the record that the follow-up appointment took place

on or about November 28, 2005, and plaintiff presumably received his anti-inflammatory injection at that time without incident.

Plaintiff continued to experience vision problems. As a result, on December 20, 2005, he saw Dr. Beisiegel, an optometrist with ODOC. Dr. Beisiegel diagnosed plaintiff with another retinal detachment and referred him back to Dr. Sung within a week, "possibly today if transport isn't ice-bound." *Id* at 614-15. Dr. Sung found scar tissue and performed a second surgery to remove the tissue on February 27, 2006. *Id* at 636-37.

Following this second surgery, Dr. Sung prescribed anti-inflammatory eye drops. According to plaintiff, the drops were to reduce his pain and improve his vision, but he ran out of drops on December 28, 2006, and, despite repeated requests to refill his prescription, the drops were not refilled until a month later. Wik Affidavit, pp. 15-17. He also asserts that prison staff failed to advise him that Dr. Sung had reduced the prescription dosage in early November 2006, resulting in his use of more drops than prescribed for a period of nearly two months. *Id* at 17. Defendants agree that eye drops were prescribed, but otherwise deny these allegations.

Plaintiff also asserts that Dr. Sung's office recommended that plaintiff obtain glasses to help his eye heal, but that TRCI staff repeatedly failed to order glasses for him until April of 2007. Defendants deny this, and the medical record before the court

6 - OPINION AND ORDER

reflects only that Dr. Sung wrote "new glasses OK to get."  Hawkins
Affidavit, Att. 1 at 623.  On February 6, 2007, Dr. Anderson, an
ODOC optometrist, examined plaintiff's eyes and ordered him new
glasses which arrived and were issued to plaintiff approximately
sixty days later.  Hawkins Affidavit, Att. 1, p. 592.

Plaintiff filed this 42 U.S.C. § 1983 civil rights case on
November 19, 2007.  He alleges that defendants were deliberately
indifferent to his serious medical needs in violation of the Eighth
Amendment when they:

1.   Failed to adequately address his injury after he
     was hit with the basketball;

2.   Failed to properly train and supervise Department
     of Corrections employees responsible for providing
     plaintiff with medical care following his injury;

3.   Did not provide plaintiff with eye glasses until
     six months after his prescription was written; and

4.   Failed to provide him with his prescribed
     antibiotics and eye drops, thereby causing his
     vision to suffer.

## STANDARDS

A party is entitled to summary judgment where the documentary
evidence produced by the parties permits only one conclusion.
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  A
party seeking summary judgment bears the initial responsibility of
informing the court of the basis of its motion, and "identifying
those portions of pleadings, depositions, answers to
interrogatories, and admissions on file, together with the

7 - OPINION AND ORDER

affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal citation omitted).

"If the moving party meets its initial burden of showing 'the absence of a material and triable issue of fact,' 'the burden then moves to the opposing party, who must present significant probative evidence tending to support its claim or defense.'" *Intel Corp. v. Hartford Acc. & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991) (quoting *Richards v. Neilsen Freight Lines*, 810 F.2d 898, 902 (9th Cir. 1987)). Plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Industrial Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). Rather, he must come forward with sufficient evidence demonstrating to the court that there are genuine issues of material fact to be decided at trial. Fed. R. Civ. P. 56(e).

Plaintiff may not simply rely upon the pleadings to designate specific facts establishing a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 324. The existence of a genuine issue of material fact may be demonstrated through the use of affidavits, depositions, answers to interrogatories, and admissions. *Id; see also* Fed. R. Civ. P. 56(c). If "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal citation omitted).

8 - OPINION AND ORDER

**DISCUSSION**

I.   **Eighth Amendment Standards.**

In order to prevail on an Eighth Amendment medical claim, plaintiff must prove that defendants were deliberately indifferent to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104-105 (1976); *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000). Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay or intentionally interfere with medical treatment. *Lopez*, 203 F.3d at 1131; *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir.), *cert. denied*, 519 U.S. 1029 (1996).

The indifference to medical needs must, however, be substantial. *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir.1990). Inadequate treatment due to malpractice or even gross negligence, does not constitute an Eighth Amendment violation. *Id; Lopez*, 203 F.3d at 1131. A difference of medical opinion between doctors over medical treatment does not amount to deliberate indifference to serious medical needs. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). Rather, plaintiff must show that the course of treatment undertaken was medically unacceptable under the circumstances, and that the defendants chose this course in conscious disregard of an excessive risk to plaintiff's health. *Id.*

///

II.  **Eighth Amendment Analysis**.

Plaintiff's case arises out of the delay he perceives in the treatment of his eye injury.  Defendants hired an expert, Dr. William B. Baer, to comprehensively review plaintiff's medical file for purposes of this lawsuit.  According to Dr. Baer, plaintiff received "prompt attention to each of his visual complaints."  Baer Report, p. 2.  He further concluded that plaintiff "received, at each of his events, prompt attention and effective and expert medical care."  *Id.*  The standard of care Dr. Baer describes easily exceeds that required by the Eighth Amendment.

In addition, where an inmate alleges an Eighth Amendment violation based on a delay in surgery, he must establish that the delay harmed him.  *McGuckin v. Smith*, 974 F.2d 1050, 1055 (9th Cir. 1992), *overruled on other grounds by WMX Tech., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1998).  "Mere delay of surgery, without more, is insufficient to state a claim of deliberate medical indifference."  *Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985).  Even assuming there was nine-day delay between the time Dr. Lytle knew plaintiff was experiencing problems with his vision, and plaintiff's August 12, 2005 surgery, any such delay did not cause him any harm.  Dr. Baer found that plaintiff's "visual outcome is quite good and is a testimonial to the quality of care received."  Baer Report, p. 3.  In fact, on

April 13, 2007, plaintiff's visual acuity in his right eye (with correction) was 20/30. *Id* at 3. Dr. Baer further concluded:

> After some complications and the need for further surgery, Mr. Wik has been left with remarkably good function in his right eye. He had, for a while, double vision probably as a result of the first retinal reattachment surgery. This is not an uncommon problem and usually is manageable by manipulation of spectacle prescription and usually improves with time. He also was made myopic by the surgery. This is not a complication of the surgery but a consequence of the changes which the surgery imposes upon the eye and is an expected result. The development of epiretinal membranes after retinal reattachment surgery is not uncommon. In this case they have managed successfully. Considering these factors, it is unlikely that there would have been a different course had the surgery been undertaken a few days earlier. The earliest date when the diagnosis might have been made is 08/05/2005. The surgery was done one week later. The visual outcome is quite good. It is unlikely that the postoperative complications would have been any different had the surgery been performed earlier.

Baer Report, pp. 2-3.

Plaintiff has provided no rebuttal expert testimony, something which defendants argue is fatal to his opposition to their Motion for Summary Judgment. Plaintiff and defendants are each able to cite to a variety of cases which either require, or do not require, rebuttal expert testimony on a plaintiff's behalf in order to overcome a defendant's summary judgment motion in a medical case. The common thread in plaintiff's cited cases is that straightforward medical issues do not require competing expert medical testimony in order to survive a summary judgment motion. This case, however, involves a complex medical question pertaining to the standard of care expected among general surgeons,

11 - OPINION AND ORDER

ophthalmologists, and general nurses with respect to issues of vitreous collapse and retinal detachment. Plaintiff's interpretation of his own medical records is not sufficient to create a triable issue of fact.

Plaintiff also contends that defendants' Motion for Summary Judgment does not address Claims Two, Three, and Four. Claims Two, Three, and Four are all subsumed by plaintiff's first claim that defendants failed to adequately treat his eye injury. Specifically, the conclusion that plaintiff received adequate medical care following his eye injury naturally leads to the dismissal of plaintiff's failure to train and supervise claim (Claim Two).

Claim Three focuses more specifically on the delay in providing plaintiff with eyeglasses which he contends were medically necessary following his optical surgery. This naturally falls under plaintiff's broader claim that defendants failed to properly treat him following his injury (Claim One). As previously noted, the medical record before the court reflects only that Dr. Sung wrote "new glasses OK to get"; it does not show that Dr. Sung thought they were medically necessary to treat his injury. Hawkins Affidavit, Att. 1 at 623. Similarly, Dr. Baer's report does not identify glasses as medically significant in plaintiff's case. In addition, Dr. Anderson ordered new glasses for plaintiff on the same day he examined his eyes, and provided those new glasses to

plaintiff within 60 days of his exam, time frames which do not suggest willful indifference. *Id* at 592. Moreover, there is no medical evidence that plaintiff suffered any injury as the result of any delay in providing him with his glasses.

Claim Four focuses on plaintiff's allegations regarding the deprivation of anti-inflammatory eyedrops for a 30-day period, and the failure of the TRCI medical staff to notify plaintiff that Dr. Sung reduced the amount of his prescription, resulting in plaintiff's use of more drops than necessary for a period of less than two months. Again, this claim logically falls within the general allegation from Claim One that defendants failed to properly treat his eye injury. The time during which plaintiff alleges that he did not have any eyedrops occurred ten months following his second surgery, the purpose of which was to remove scar tissue.

There has been no showing that the eyedrops were medically significant in the treatment of plaintiff's eye at that point in time, nor is there any medical evidence that plaintiff suffered injury as a result of not having the eyedrops for that 30-day period or as a result of applying too many drops to his eye. Indeed, Dr. Baer's report, which outlines all of the medically significant events in this case, does not mention plaintiff's eyedrops as medically significant at any time. Nothing in the record leads the court to conclude that there was a serious medical

need for the eyedrops during the time they were not provided, nor does the 30-day delay in refilling plaintiff's prescription ten months after his surgery equate to willful indifference on the part of defendants.

A thorough review of the record shows that defendants were highly responsive to plaintiff's numerous complaints and requests, and that they went to great lengths to provide plaintiff with the medical care he required as immediately as could be expected. While plaintiff may not have received perfect medical care, the Eighth Amendment only requires that defendants not act with deliberate indifference to his serious medical needs. The record, taken as a whole, could not lead a rational trier of fact to conclude that defendants acted deliberate indifference. Accordingly, summary judgment is appropriate.

## CONCLUSION

Defendants' Motion for Summary Judgment [37] is GRANTED, and plaintiff's claims are DISMISSED with prejudice.

IT IS SO ORDERED.

DATED this  17th  day of July, 2009.

                        _____/s/Ancer L. Haggerty__
                        Ancer L. Haggerty
                        United States District Judge

14 - OPINION AND ORDER